DAVEY *v.* HALL & MUNSON CO.

INJURY TO EMPLOYÉ—ASSUMPTION OF RISK.

> The ends of the cross-planking of a tramway, on which plaintiff was employed as a driver, extended beyond the stringers from 8 to 14 inches. Many of them became broken, being of a poor quality of pine, and when so broken were never repaired. There was barely room for a person to stand upon them when a loaded car was on the track. The space between the rails was doubly planked, and was maintained in a safe condition. Plaintiff, while lifting a derailed car, threw his weight on the end of one of the planks, and it broke and caused his injury. He had had five years' experience about the tramway, and knew that the car could be replaced without his standing outside the stringer. *Held,* that he assumed the risk. MONTGOMERY and MOORE, JJ., dissenting.

Error to Chippewa; Steere, J. Submitted April 5, 1899. Decided December 12, 1899.

Case by James Davey against the Hall & Munson Company for personal injuries. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Affirmed.

*Warner & Sullivan*, for appellant.

*E. S. B. Sutton* (*John W. Shine*, of counsel), for appellee.

MONTGOMERY, J. (*dissenting*). This is an action for personal injuries received by the plaintiff through the alleged negligence of defendant in failing to provide a safe place for plaintiff to work in, and to properly construct, inspect, renew, and repair a certain tramway upon which plaintiff was employed as driver, and a fall from which caused the injury. Defendant is the owner of a large lumber-manufacturing plant at Bay Mills, in Chippewa county, composed of sawmills, factories, lumber

yards and docks, and about three miles of elevated tramways. The tramways are about 12 or 15 feet above the ground, and constructed in bents built of 8x8 timbers, with two posts or uprights, a sill on the bottom, and a cap or crosspiece on the top. These bents are 16 feet apart, and support 4x10-inch stringers, placed on their edges. On the stringers, crosswise of the tramway, are the pine cross-planks, which are nailed to the stringers. On the cross-planking, and directly over the stringer, is a bed-plate or plank, 2x10 inches, laid flat, upon which the iron rails rest which carry the tram-cars. The particular tram in question in this case, known as the "Grand-Stand Tram," was built six years prior to the injury of plaintiff; and planks taken from another tram, known as the "Canadian Tram," where they had already been in use a number of years, were used for the cross-planking. These planks were not sound when put in the Grand-Stand tram, and the attention of the foreman was called to that fact. This cross-planking all along the tramway extends out beyond the stringer and bedplate from 10 to 14 inches; the ends being without support underneath or covering on top. It is claimed by defendant that these ends were not a necessary part of the tramway, which it was its duty to keep in repair; while plaintiff claims they were an essential part of the tramway, upon which it was frequently necessary for himself and other employés to walk or stand. The cross-planking between the rails was covered with boards called "sheathing," laid lengthwise of the tram and crosswise of the planking, upon which the horse walked when drawing the cars; so that the only parts of the cross-planking which could be seen by the driver, when on the tram, were the ends which extended outside the bedpiece. Underneath the bedpiece, and between that and the stringer, this cross-planking had become decayed, —so much so that in places, where it became necessary to replace a broken bedpiece, the cross-planking would not hold the spikes; and the attention of the superintendent and foreman had been called to that fact. At frequent

intervals along the whole tramway, ends of cross-planking had been broken off by lumber falling upon them, by cars running off the track, and in various ways; but the ends of the planking, so far as could be seen without taking up the bedpiece, appeared sound, according to the weight of evidence, including the testimony of the defendant's foreman, McKean.

It was a frequent occurrence that tram-cars were derailed, and it then became the duty of the tram driver to call assistance, and get the car back on the rails. At the time of the injury, a car had become derailed, and plaintiff called assistance to get it back on the track. There is a dispute in the testimony both as to the usual method of putting derailed cars on the track, and as to the method employed by plaintiff; plaintiff claiming that he went about it in the usual way, which was the quickest way, and defendant claiming that the method employed was unusual and more dangerous. Plaintiff testified that, in case of a heavy load, it was usual and necessary to use a pry, and stand in the center of the track, but in the case of a small load it was not necessary. According to the plaintiff's testimony, he had taken a short piece of 2x4 to use as a lever, and had stepped one foot outside the rail onto the projecting end of the cross-planking, and was standing in that position, one foot outside and one foot inside the rail, with the end of the 2x4 inside the rail for a purchase, and pressing against the forward wheel of the car to swing it on the track as the other men lifted up the end of the car; and as they lifted, and he put his weight on the foot outside the rail, in using the 2x4, the end of the plank broke short off between the bedpiece and the stringer, where it had become decayed, letting plaintiff fall to the ground below, breaking his leg and injuring his back. It is claimed on the part of the defendant that plaintiff stood at the side of the car, between the two wheels, facing directly against the side of the car, and attempted to pry the car on with a lever, standing on the end of the cross-planking. The plaintiff also testified that he stepped onto the end of

the plank without making any examination to see if it was sound, and that the defect from which it broke was rot underneath the stringer.

The circuit judge directed a verdict for defendant on the ground of plaintiff's alleged contributory negligence— *First*, in adopting the more dangerous of the two methods in putting the car on the track; and, *second*, because "he took no pains to look to see whether this plank was weak or strong; that he did not observe to see whether it was rotten or sound." The defendant also contends in this court that the ends of the plank were not a place to work provided by defendant.

The court below treated the case as a proper one for the application of the rule that where one has the opportunity of choosing between two methods of doing work, and chooses to adopt one which is obviously dangerous, the master is not responsible for the risk assumed. It seems to us that whether this case is a proper one for the application of this rule must depend upon whether, as matter of law, we are able to say that the ends of these planks were not intended for or adapted to the use to which they were put; in other words, whether the ends were a part of the tramway which the employés had a right to occupy in the performance of this duty. We are not prepared to say, as matter of law, that they might not have been so used with entire propriety. It is true, there was a method of lifting these cars onto the track without stepping onto the plank, but it appears it was not the only method. It might not have been the only safe method if the plank had been sound.

The plaintiff testified that he took no notice of the plank, as to whether it was sound or weak; that he was intent on getting the car on the track; that he saw there was a plank there to put his foot on. It is claimed this was contributory negligence. We would have no hesitancy in holding that it was, if it appeared conclusively that an inspection of the plank would have disclosed its weakness; but the testimony on this point was contradictory.

122 MICH.—14.

The question should, therefore, have been submitted to the jury.

MOORE, J., concurred with MONTGOMERY, J.

GRANT, C. J. The following facts are established by the evidence: These tramways were constructed in the usual manner and of the usual material. They are not constructed of the best and sound lumber, but of culled and knotty white pine. The ends of the planks are not supported, and extend from 8 or 10 to 14 inches outside the stringer. The plank between the rails is covered with inch boards, to make it safe for the horses and men in charge to walk on. Cars derailed frequently cut, indent, and break the ends of the plank. Many of the ends of the tramway where the plaintiff was hurt were thus broken. They were never repaired. In fact, the only way they could be repaired would be to raise the rail, remove the planks, and insert new ones. It was the duty of plaintiff and others to report any defects in the tramway to the tramway repairers provided by defendant. Defects in the ends of these planks were never reported, although they were known both to plaintiff and others. Pries were furnished for the purpose of raising the derailed cars and putting them upon the track. It was dangerous to walk upon these ends, and still more dangerous to stand upon them and lift, or to use them as a fulcrum to raise the cars. Mr. Hawes, the only witness for plaintiff besides himself, testified that it was dangerous and risky to get out upon them, even to walk. These single tramways were designed only for the use of the employés in charge of the horses and cars. They were not designed as passageways for other employés. The "bunks," as they are called, extend 6 to 8 inches over the sides of the cars, leaving barely room, as plaintiff testified, for a man to stand upon the end of the plank, with a loaded car upon the track. The danger in attempting to do so while a car is passing is apparent. The distance from the sides of the car to the ends of the planks did not exceed 4 to 8 inches. It is not possible that these spaces were intended for travel. Plain-

tiff had been at work in these yards and tramways for five years, and was perfectly familiar with their condition, but made no protest, and never even suggested that the ends of the plank needed repairing. He stood upon this plank, and lifted, as he testified, with one foot outside the stringer and one in, or as another witness, who stood near him, testified, with both feet upon the end of the plank, without any examination or sounding of the plank. He testified that he took no notice of the plank at all, and stepped on it regardless of whether it was solid or weak. Under these circumstances, I think the instruction of the court was correct. I see no reason or justice in permitting a recovery. It would be dangerous to use the ends of even new pine plank as a fulcrum for lifting in the way the plaintiff did. It is probable that, had he sounded the plank with his lever, it would have disclosed the defect, if any there was. The pressure upon the plank must have been great, in the attempt to lift or push the car with the lumber upon it. No claim is made that the space between the rails was not in safe condition. The defendant furnished the means and a perfectly safe place and a safe way to lift these derailed cars upon the track. If plaintiff chose to use an unsafe one, he did so at his own risk. *Goff* v. *Railway Co.,* 86 Wis. 237; *Richmond, etc., R. Co.* v. *Bivins,* 103 Ala. 142; *Romona Stone Co.* v. *Phillips,* 11 Ind. App. 118; *Erskine* v. *Beet-Sugar Co.,* 71 Fed. 270; *Gowen* v. *Harley,* 6 C. C. A. 190, 56 Fed. 973; *Shackelton* v. *Railroad Co.,* 107 Mich. 16; *Perlick* v. *Wooden-Ware Co.,* 119 Mich. 331. There is no evidence of any express or implied instruction or direction to plaintiff or other employés to adopt the means which plaintiff did to replace these derailed cars. Even if other employés had adopted such methods, it would not bind the defendant, and compel it to respond in damages. *Goff* v. *Railway Co., supra.*

I think the judgment should be affirmed. It is so ordered.

HOOKER and LONG, JJ., concurred with GRANT, C. J.